Robert T. Mills (Arizona Bar #018853)
Sean A. Woods (Arizona Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
swoods@millsandwoods.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Debra Morales Ruiz, an individual, for herself and on behalf of and as pending Personal Representative of The Estate of Alexander Chavez; Alex George Chavez, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>County of Maricopa, a governmental entity; Brandon Smith and Jane Doe Smith; Paul Penzone and Jane Doe Penzone; David Crutchfield, an individual; Lisa Struble, an individual; Kyle Moody and Jane Doe Moody; Arturo Dimas and Jane Doe Dimas; Tyler Park and Jane Doe Park; Gerardo Magat and Jane Doe Magat; Daniel Hawkins Jr. and Jane Doe Hawkins; Javier Montano and Jane Doe Montano; James Dailey and Jane Doe Dailey; Trevor Martin and Jane Doe Martin; Greggory Hertig and Jane Doe Hertig; John Chester and Jane Doe Chester; Jorge Espinosa Jr. and Jane Doe Espinosa; Morgan Rainey and John Doe Rainey; Stefanie Marsland and John Doe Marsland; and, John and Jane Does 1-40,<br><br>Defendants. | No.: CV-23-02482-PHX-SRB (DMF)<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>(Assigned to the Honorable Susan R. Bolton and referred to the Honorable Deborah M. Fine) |

Through counsel undersigned, Plaintiffs hereby respond in opposition to the "Motion to Dismiss Second Amended Complaint" (the "MTD") filed by Defendants Maricopa County, Struble, Crutchfield, Dimas, Hawkins, Hertig, Martin, Montano, Moody, Park, Smith, Chester, Rainey, Marsland, Magat, Dailey, Espinoza, Jr., Maricopa County Sheriff Russell Skinner, and former Maricopa County Sheriff Paul Penzone (collectively, "Defendants"). This Response is supported by the Memorandum of Points and Authorities below.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      STANDARD OF REVIEW**

The purpose of a Motion to Dismiss is merely to test the sufficiency of a complaint and determine if it is pled with enough specificity to put the Defendants on notice of the claims filed against them. Fed R. Civ. P. 8, 12(b)(6). The Supreme Court has held that there is no heightened pleading requirement for Plaintiffs in civil rights cases. *Leatherman v. Tarrout County Narcotics Intelligence Unit*, 507 U.S. 163, 113 S. Ct. 1160 (1993).

Plaintiffs' Second Amended Complaint (the "SAC") contains sufficient allegations to satisfy the 12(b)(6) standard and plead facts far beyond a "speculative level." *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007). A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). *Twombly* requires more than assertions devoid of "further factual enhancement." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555-57). Allegations of material fact should be viewed "in a light most favorable to [Plaintiffs]." *Wyler Summit Partnership v. Turner Broad. Sys. Inc.*, 135 F.3d 658, 661

(9th Cir. 1998). The Court will only grant a Rule 12(b)(6) motion to dismiss "where it appears, beyond a doubt, that the plaintiff can prove no set of facts that would entitle it to relief." *Morley v. Walker*, 175 F.3d 756, 759 (9th Cir. 1999).

The SAC must be construed with the assumption that "all of its allegations are true," even if doubtful. In other words, its claims must survive even if it appears that "recovery is very remote and unlikely." *Twombly*, 550 U.S. 544; *see also Neitzke v. Williams*, 490 U.S. 319 (1989); *Allison v. California Authority*, 419 F.2d 822 (9th Cir. 1969). As shown below, Plaintiffs have clearly set forth specific facts, and a cognizable legal theory, sufficient to survive a motion to dismiss for failure to state a claim.

## II. ARGUMENT

### A. Defendants Struble and Crutchfield Should Not be Dismissed.

Struble and Crutchfield, as the CHS Director and CHS Medical Director, respectively, SAC ¶¶ 27-28, were both directly responsible for their employees. They both specifically directed decedent Alexander Chavez' ("Alexander's") medical care. Upon information and belief, the CHS medical files show an entry for "CHS Medical Director MD" and that entry is actually Struble. SAC ¶¶ 83-84. While that entry may actually have been Crutchfield, based on the ambiguous records received by Plaintiffs through a public records request, it is impossible to know exactly. Defendants have sole custody and control of these records, and Plaintiffs have made every effort that they can at this point to properly assign allegations to unknown individuals.

> [A] defendant may be held liable as a supervisor under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."

3

*Atayde v. Napa State Hosp.*, 255 F. Supp. 3d 978, 995 (E.D. Cal. 2017) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).

Here, the SAC alleges that Struble placed Alexander under the opiate protocol, which in turn required that multiple prescriptions be administered to him twice a day – including Hydroxyzine, Loperamide, and Ondansetron. *See* SAC ¶¶ 82, 105. However, the SAC also alleges that only ***one*** dose of Hydroxyzine – and ***no*** other medications – were administered to him. SAC ¶¶ 85-87, 105-06. As Struble (or Crutchfield) was the person who ordered these medications, *see* SAC ¶¶ 82-83, but no employees – including Struble or Crutchfield – followed up to provide these needed medications, Alexander was forced to deal with withdrawal symptoms that caused extreme pain and distress, alone and not on suicide watch. SAC ¶¶ 88-89. The SAC alleges that Struble and Crutchfield were each "responsible for ensuring CHS staff followed through with administration of needed medical care," but that needed care "did not happen due to [their] lack of management and oversight . . . ." SAC ¶¶ 103-04. The SAC further alleges how dangerous this can be. SAC ¶¶ 88-92. Struble's (or Crutchfield's) deliberate failure to ensure that needed, and required, medications were given to Alexander exacerbated that very situation. Moreover, that failure amounts to a recognition that those medications were necessary and that it was objectively unreasonable to fail to provide the same.

In summary, the "CHS Medical Director" (either Struble or Crutchfield) was directly involved in Alexander's care by prescribing, yet failing, to ensure he was given his needed medications. The extreme pain and anguish Alexander experienced from the lack of medications led directly to his committing suicide. Assuming the facts pled in the SAC

4

are true – which the Court must at this stage – Struble and Crutchfield must survive as Defendants. At the very least, Defendants should provide the names associated with the purported "CHS Medical Director" entries in Alexander's files, and Plaintiffs should be allowed to further amend to properly delineate the parties.

### B. The Federal and State Law Claims Against Defendants Must Survive Dismissal.

Plaintiffs have alleged that Defendant Sheriff Paul Penzone was tasked with oversight of the MCSO and was responsible for all its policies and procedures. SAC ¶ 14. Moreover, they have also alleged that Penzone is responsible for MCSO officials, employees, and agents, including without limitation each of the Defendants Smith, Moody, Dimas, Park, Magat, Hawkins, Montano, Dailey, Martin, Hertig, and Espinosa (collectively, the "Guards") as well as Defendants Chester, Rainey, and Marsland. *Id.* The SAC further alleges that Defendant Captain Brandon Smith was at all times relevant to this complaint, a Captain of the MCSO's Detention division. SAC ¶ 13.

The SAC alleges that each of the Guards were assigned to the Jail on the day of Alexander's death, *see* SAC ¶ 125, and that each had a responsibility to ensure Alexander's safety and well-being, *see* SAC ¶ 124. It also alleges that due to their participation in daily briefings, during which "inmates are discussed[,] as well as any out of the ordinary events – such as [Alexander's] overdose attempt," and the fact that they are "required to review their inmates' booking records and updates to the same," each of the Guards ***knew***:

- "that [Alexander] was initially classified as psychiatric, had attempted to overdose, was taken to the hospital, returned, and was transferred to his general population cell;"

5

- "that [Alexander] had fallen out of his bunk and was unresponsive on August 7, 2022 and that a 'mandown' call was made for that event;

- "that Chavez was "holding his breath" in an attempt to call out for help;"

- "that [Alexander] was suffering from severe opiate withdrawals;"

- that, as "the records show that no medication had been given to [him] for his opiate withdrawals and that COWS protocols were in place, . . . that [Alexander] was at risk for ending his excruciating symptoms by potentially taking his own life through suicide," and;

- that Alexander "was a ***high risk of suicide***."

SAC ¶¶ 110-120 (emphasis added).  Furthermore, Plaintiffs allege that despite all the above, each of the Guards "failed to conduct watches at the appropriate intervals – leaving [Alexander] to deal with extreme opiate withdrawals by himself and with access to materials he could use to commit suicide."  SAC ¶ 121.  As alleged, the Guards knew that their failure to monitor Alexander:

> would lead to a substantial risk of serious harm to [him].  Yet, they did just that – they ignored [him] for a substantial period of time, fully appreciating that [he] had had multiple 'mandown' events, one for each day he had been in their custody, and that by doing so would expose [him] to a substantial risk of serious harm.

SAC ¶¶ 122-23.

With respect to all Defendants, Plaintiffs allege that each of them knew Alexander was initially classified as "Psychiatric" and had just attempted to take his own life via drug overdose.  *See* SAC ¶¶ 62, 65, 114.  Additionally, the SAC alleges that the failure to put Alexander on suicide watch was a responsibility of each and every Defendant.  *See* SAC ¶¶ 62, 125. The SAC alleges that – at minimum – Park, Magat, Hawkins, Espinosa, and Moody all conducted patrols and headcounts in Alexander's unit on the day of, and up to,

6

his death. SAC ¶ 131. Moreover, it alleges that each of the Guards failed to conduct a headcount at 1800 hours – and in fact, the log entry for that time was left blank despite headcounts occurring at other hourly intervals. *See* SAC ¶¶ 134-41.

Additionally, Plaintiffs allege that just after he had intentionally overdosed on fentanyl, "[d]espite being searched, sent to the emergency room, sent back to intake, all while in custody of MCSO, somehow, [Alexander] was [still] able to get his hands on ***more*** fentanyl." SAC ¶ 47 (emphasis added). The SAC also alleges that instead of trying to help Alexander, Defendants instead disciplined him for possession of fentanyl, SAC ¶¶ 66-69, which "contributed to [his] rapidly deteriorating mental state," SAC ¶ 69. Moreover, Plaintiffs allege that because Alexander had initially been classified as "Psychiatric," and had just overdosed on fentanyl, Defendants each had a duty to ensure he was placed in restrictive housing, a duty each failed to carry out. *See* SAC ¶¶ 69-70. Moreover, Plaintiffs allege that one day prior to his suicide, Jail staff found Alexander unresponsive and in the fetal position in his cell, threatened to put him in a ***monitored room***, and then left him because he began "breathing." *See* SAC ¶¶ 76-78. CHS records state that Alexander was ***intentionally "holding his breath***," and when "told ***mental health*** would be called and he could be place[d] in a monitored room [he] stopped holding [his] breath and began breathing normally[,] but still [would] not provid[e] [his] arm for vitals." SAC ¶ 79 (emphasis added) (quoting CHS records). Those records also state that he "was assessed with '***ineffective coping***' and that the 'Plan' was to 'report to oncoming shift. will reassess for detox. on next rounds for detox.'" SAC ¶ 80 (emphasis added) (quoting CHS records).

7

With respect to supervisor liability, Plaintiffs have alleged that Penzone and Smith are charged with implementing and maintaining policies and procedures for the MCSO, its employees, and its jails – including the Lower Buckeye Jail. SAC ¶ 98. They have also alleged that Penzone and Smith are charged with oversight of their jail facilities, *id.*, and that they are required to review employee actions regularly to ensure MCSO policies and procedures are being followed, *id.* Additionally, the SAC alleges that the lack of oversight caused headcounts to not be performed at the required hourly intervals. SAC ¶ 101.

The SAC alleges that Penzone and Smith are required to:

• Maintain physical control over all inmates to prevent harm to both staff and other inmates; and

• Implement, evaluate and maintain security procedures and protocols in accordance with industry standards to protect both staff and other inmates; and

• Act affirmatively to protect inmates when a potential threat or risk of harm to either staff or another inmate becomes known to them; and

• Hire, train, and supervise corrections officers and staff in a manner that thoroughly ensures the mission of the Arizona Department of Corrections is carried out regarding the physical protection of all staff and inmates; and

• Maintain strong presence of supervision, control, and oversight over corrections officers and all prison personnel; and

• Provide medical care and treatment for all inmates according to the standard of care recognized by the industry.

SAC ¶ 156.

Plaintiffs have pled that according to Defendants' own records, Alexander had been presumed to have been unattended for 25 minutes. *See* SAC ¶ 94. Because of the supervisors' failure to ensure officers were regularly and properly conducting headcounts, Alexander was not observed at or around 1800 hours, and was only found at 1825 hours.

*See* SAC ¶¶ 94, 131-38. The SAC alleges enough of a causal link between the supervisors' failure to ensure officers and employees were adhering to their prescribed duties, and the fact that Alexander would have been discovered prior to his suicide in enough time to save his life. Moreover, the SAC also pleads sufficient facts that the Guards not only failed in their duties, but were objectively unreasonable in their failure to ensure Alexander's safety. It is not an unreasonable inference that checking on Alexander at 1800 hours would have saved his life. Defendants' own records demonstrate that Alexander commenced his suicide attempt 25 minutes prior to Moody's cell check at 1825 hours. SAC ¶¶ 92, 132-33. He did not spontaneously have a noose to commit suicide with. He had to fashion one. It is not unreasonable to infer that had they performed their regular – and required, SAC ¶ 134 – hourly rounds at 1800, the Guards would have been able to see him ripping fabric or fashioning a noose, or even with the noose around his neck.

In Arizona, "[t]o be grossly negligent, the actor's conduct must create an unreasonable risk of physical harm to another, and such risk must be substantially greater than the risk involved in ordinary negligence." *Rourk v. State*, 821 P.2d 273, 280 (Ariz. App. 1991). Additionally, "[g]ross negligence is generally a question of fact that is determined by a jury." *Armenta v. City of Casa Grande*, 71 P.3d 359, 365 (Ariz. App. 2003). As explained herein, the SAC specifically alleges that each of Penzone's, Smith's, and the Guards', actions and conduct created an unreasonable risk of physical harm to Alexander. That risk of harm was so great that it could have, and did, result in Alexander's death. Defendants gave him a suicide prevention and awareness pamphlet. *See* SAC ¶ 166. They specifically knew that he was at risk of suicide, but did nothing else to protect him.

9

In fact, on August 7 2022, jail staff threatened to put him in a monitored cell, but didn't. *See* SAC ¶¶ 77-78.

In light of the above, Plaintiffs' have sufficiently stated federal and state law claims against Defendants, and those claims must survive dismissal.

C. **The SAC Sufficiently Alleges That Defendants Marsland, Rainey, and Chester Acted Improperly, and That Their Actions Were Objectively Unreasonable and Grossly Negligent.**

The MTD argues that Defendants Marsland, Rainey, and Chester acted properly. Not so.

"Incapacitated criminal defendants have liberty interests in freedom from incarceration and in restorative treatment." *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003). When determining whether a failure to provide timely restorative treatment constitutes a violation of the Fourteenth Amendment, courts must balance the detainee's liberty interests against the legitimate interests of the state. *Id.* (citing *Youngberg*, 457 U.S. at 321).

In *Atayde v. Napa State Hosp.,* 255 F. Supp. 3d 978 (E.D. Cal. 2017), a case that also involved a prison-suicide and claims for § 1983 violations, the decedent had also engaged in self-harming behaviors. *Id.* at 986. However, in contrast to the circumstances here, the defendants in that case had actually placed the decedent into a safety cell. *Id*. The *Atayde* court held that "when considering a motion to dismiss such a claim, a district court must consider whether the plaintiff has pled sufficient facts to permit the court to infer the plaintiff had a 'serious medical need' and a defendant was 'deliberately indifferent' to that need." *Id.* The Ninth Circuit has held that "a heightened suicide risk can present [such] a

10

serious medical need." *Simmons v. Navajo County*, 609 F.3d 1011, 1018 (9th Cir. 2010). Furthermore, "deliberate indifference may be shown where **prison officials or practitioners** 'deny, delay, or intentionally interfere with medical treatment.'" *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (emphasis added); *see also Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976) (finding that delays in providing medical care may show deliberate indifference).

Defendants Marsland and Rainey completed Alexander's intake documents. SAC ¶ 38. The SAC alleges that Alexander was an opiate addict who had attempted suicide by overdosing on fentanyl pills just prior to his actual suicide. *See* SAC ¶ 41. As alleged, they were each fully aware that he had just intentionally attempted to take his own life. *See* SAC ¶¶ 54, 58, 67. Defendants Rainey and Chester even gave him a suicide prevention/awareness flyer. *See* SAC ¶¶ 53-54. Moreover, "[Defendant] Rainey had Alexander sign a waiver form refusing Administrative Restrictive Housing." SAC ¶ 64. The SAC further alleges that despite "ample opportunities and reasons to assign [Alexander] to the proper classifications and put him on suicide watch," not one Defendant did. SAC ¶¶ 68, 71. Moreover, Plaintiffs allege that Defendants Marsland, Rainey, and Chester "had a duty to assure the safety and well-being of Alexander [ ] while in their care, custody and control," SAC ¶ 201, a duty they breached by allowing a clearly suicidal inmate to not be put on suicide watch, *see* SAC ¶¶ 59-62, 72.

Defendants had the sole responsibility for Alexander's care. *See* SAC ¶ 203. Because of their delay in providing him with proper medical care – including administering the medicine which he had been prescribed – and their failure to put him on suicide watch,

Defendants were objectively deliberately indifferent to Alexander's constitutional rights. Plaintiffs have sufficiently stated claims against Defendants Morgan, Rainey, and Chester to survive dismissal.

### D. **Plaintiffs Have Sufficiently Stated a *Monell* Claim Against Defendants Maricopa County, Penzone, and Skinner.**

Defendants offer various complaints against Plaintiffs' *Monell* claim (Count IV), but all of them miss the mark. To start, they state that "[t]here are no allegations that any specific County/MCSO policy was deficient, or that there was an improper custom or practice." MTD 11:3-5. First, to plead a *Monell* claim Plaintiffs are not required to set forth the ***details*** of the specific policies that were deficient – rather, they must merely "allege facts that would support the ***existence*** of the alleged policy, practice, or custom." *Stuart v. City of Scottsdale*, No. CV-21-01917-PHX-DJH, at *10 (D. Ariz. Nov. 7, 2024) (emphasis omitted and added) (first citing *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012); and then citing *Dougherty v. City of Covina*, 654 F.3d 892, 900-01 (9th Cir. 2011)).

Here, Plaintiffs ***have*** alleged facts supporting the existence of deficient policies, practices, or customs. Citing an Arizona Republic article, the SAC alleges that the inmate death rate in Maricopa County jails climbed to "astronomical" levels by 2022 – even when compared to deaths in more populated jail systems – the same year Alexander committed suicide, having ***quadrupled*** in only three years. *See* SAC ¶¶ 168-79. It further alleges that "[t]he leading causes of death in MCSO and Maricopa jails are drug overdoses, drug withdrawals, and ***suicides***," and that "suicides accounted for one-quarter of deaths in MCSO and CHS Jails in 2022." SAC ¶¶ 171, 179 (emphasis added). Plaintiffs allege that

12

understaffing "has hindered operations and challenged efforts to maintain safe conditions." SAC ¶ 172. "Understaffing" is a specific policy, practice, or custom. Moreover, the SAC alleges that:

> [Defendant] Skinner said in a statement. "In addition to the recent projects implemented involving training, scanners, prevention services through our tablet program, and narcotic K9s in our jail facilities, we are working to enhance additional services through the use of medical monitoring technology," the sheriff said. "We will remain vigilant and proactive in the effort to connect inmates to needed services and prevention programs.

SAC ¶ 173 (quoting the Arizona Republic article). That Defendant Skinner has implemented new policies, practices, or customs in response to the overwhelming inmate death rate in his jails necessarily implies the existence of previous policies, practices, or customs that were deficient. As another example of a deficient policy, practice, or custom, Plaintiffs allege that Maricopa County "hid multiple deaths from their reported numbers [including Alexander's death]. For example, they did not include in the reported numbers of inmate death inmates who died in a hospital or who received a compassionate release because death was imminent." *See* SAC ¶¶ 181-83. Finally, the SAC alleges that a Carnegie Mellon professor who co-authored a book about inmate deaths reacted incredulously to Maricopa County's sky-high inmate death rate and admonished it to "review its ***policies*** for drug withdrawal treatment and suicide prevention." SAC ¶ 178 (certain emphasis omitted). Contrary to Defendants, Plaintiffs have sufficiently alleged facts supporting the existence of deficient policies, practices, or customs.

Also contrary to Defendants' claims, the SAC "point[s] to a pattern of *prior*, similar violations of federally protected rights, of which [Maricopa County, Penzone, and Skinner] had actual or constructive notice." *See* MTD 11:13-16 (quoting *Hyun Ju Park v. City &*

13

*County of Honolulu*, 952 F.3d 1136, 1142 (9th Cir. 2020).  The SAC alleges that the inmate death rate ***quadrupled*** from 2019 to 2022, the year of Alexander's suicide.  SAC ¶ 175.  While Defendants complain that the Arizona Republic article stating this fact was not published until 2024, it defies logic to suppose that by the time of Alexander's death in 2022, at the height of the surge in death, Defendants Maricopa County, Penzone, and Skinner were not fully aware (or at the very least, constructively aware) that inmate deaths in their jails were reaching astronomical levels.  Given that inmates have a clear constitutional right to be protected from threats to their health and safety, *see* **§ II(E)**, *infra*, the SAC's allegations, and all reasonable inferences therefrom, construed in Plaintiffs' favor as they must be, clearly point to a pattern of prior violations of Maricopa County inmates' constitutional rights that crested in 2022.

Finally, Defendants argue that Plaintiffs cannot state a *Monell* claim against Defendants Penzone and Skinner.  They contend, without authority, that *Monell* "is not a framework for claims against individuals."  MTD 12:4-5.  That is not the case.  While "*Monell* liability cannot attach to an individual (in his or her ***personal*** capacity)," *Hauser v. Smith*, No. CV 20-08138-PCT-JAT (JFM), at *4 (D. Ariz. June 3, 2021) (emphasis added) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989)), *Monell* claims can "be brought against defendant officers in their ***official*** capacity," *id.* (emphasis added).  The MTD does not argue that Defendants Penzone and Skinner cannot be sued under *Monell* in their official capacities.

///

///

### E. Defendants are Not Shielded From Liability by Qualified Immunity.

Defendants argue that even if Plaintiffs have sufficiently stated claims against them, they are immune from liability due to qualified immunity. "Government officials enjoy qualified immunity from civil damages unless their conduct violates clearly established statutory or constitutional rights." *Atayde*, 255 F. Supp. 3d at 994-95 (citing *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001)). *Atayde* instructs that "[w]hen determining whether qualified immunity applies, the central questions for the court are: (i) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendants' conduct violated a statutory or constitutional right; and (ii) whether the right at issue was 'clearly established.'" *Id.* (internal citations omitted). "The inquiry must be undertaken in light of the specific context of the particular case." *Id.* (citing *Saucier*, 533 U.S. at 201).

In the MTD, Defendants concede that the law is "clearly established . . . that pretrial detainees have a Fourteenth Amendment right to be housed with reasonable measures in place to abate a known risk of suicide," and that "the Ninth Circuit [has] expressly recognized . . . an inmate's constitutional right to have jail officials respond to 'a clear warning that [he] presented an imminent suicide risk.'" MTD 14:4-9 (emphasis omitted) (quoting *Regal v. County of Santa Clara*, 2023 WL 7194879, at *4 (N.D. Cal. Oct. 31, 2023); *see also Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (finding that "the general law regarding the medical treatment of prisoners was clearly established," and "it was also clearly established that [prison staff] could not intentionally deny or delay access to medical care"). Moreover, "[i]t is clearly established that the Fourteenth Amendment

15

prohibits prison officials from displaying 'deliberate indifference' to the serious medical needs of detainees in custody. If a prison official is aware of a present 'substantial risk to [an inmate's] health,' ***including a psychiatric risk***, she may not simply 'decline[] to act upon this knowledge.'" *Gilbert v. Turner*, No. 22-56217, at *3-4 (9th Cir. May 3, 2024) (internal citation omitted) (emphasis added) (quoting *Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1194 (9th Cir. 2002), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

Nevertheless, Defendants argue the SAC contains no allegations that they knew or should have known that Alexander was a suicide risk. This assertion is woefully incorrect. First, the SAC alleges that "in [Alexander's] intake documents," which Defendants Marsland and Rainey completed, "the Jail classified him properly as a sub-classification of 'Psychiatric.'" *See* SAC ¶¶ 37-38. It also alleges that each of the Guards were aware of this classification. *See* SAC ¶ 114. It further alleges that Alexander attempted suicide via intentional overdose just a few days before his actual suicide. *See* SAC ¶¶ 40-41. The SAC alleges that each Defendant knew Alexander had just attempted to take his own life. SAC ¶¶ 62, 65, 114. It further alleges, in detail, that each of the Guards was acutely aware that Alexander was at high risk for suicide. *See* 5:20-6:9, *supra*; *see also* SAC ¶¶ 110-120. It also alleges that Defendants Marsland, Rainey, and Chester were each quite aware that Alexander had just intentionally overdosed. *See* SAC ¶¶ 54, 58, 67. Very importantly, Defendants' own records, as recorded by Defendants Rainey and Chester, indicate that following that suicide attempt, Alexander was intentionally given a "**SUICIDE PREVENTION/AWARENESS FLYER**." SAC ¶ 53 (emphasis added). Each of the

16

Guards knew this. *See* SAC ¶ 140. Frankly, this allegation alone, construed with all reasonable inferences therefrom in Plaintiffs' favor, sinks Defendants' argument that the SAC does not allege they were aware, or should have been aware, that Alexander was a suicide risk. Regardless, the SAC also alleges that each Defendant should have been aware of such a risk because each "[is] charged with having knowledge of [Alexander's] Booking Records," and each "[must] read [those] records and any updates [thereto]." SAC ¶¶ 56-57. Moreover, Plaintiffs allege that on August 7, 2022 – one day prior to his suicide – Jail staff found Alexander unresponsive and in the fetal position in his cell, ***threatened to put him in a monitored room***, and then left him because he began "breathing." *See* SAC ¶¶ 76-78. CHS records state that Alexander was ***intentionally "holding his breath***," and when "told ***mental health would be called*** and he could be place[d] in a monitored room [he] stopped holding [his] breath and began breathing normally[,] but still [would] not provid[e] [his] arm for vitals." SAC ¶ 79 (emphasis added) (quoting CHS records). Those records also state that he "was assessed with '***ineffective coping***' and that the 'Plan' was to 'report to oncoming shift. will reassess for detox. on next rounds for detox.'" SAC ¶ 80 (emphasis added) (quoting CHS records). Plaintiffs allege that the Guards were all aware of this event and Alexander's recent history, and that each was "acutely aware that [Alexander] was having difficulty with his symptoms and was a high risk of suicide." *See* SAC ¶ 115-120. In light of all the allegations noted above, it strains credulity to assert that Defendants neither knew nor had reason to know that Alexander was a suicide risk.

Again, when assessing a motion to dismiss, "[t]he Court must accept all material allegations in the Complaint as true and draw all reasonable inferences [therefrom] in favor

of the plaintiff." *Bean v. McDougal Littell*, 538 F. Supp. 2d 1196, 1199 (D. Ariz. 2008) (citing *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998)). "Further, the Complaint must be read in the light most favorable to the plaintiff." *Id.* (citing *Pareto*, 139 F.3d at 699). As in *Atayde*, Plaintiffs have alleged that Defendants delayed or failed to address the serious medical needs of an inmate they knew or should have known was a suicide risk. Taking the facts pled, and all reasonable inferences in Plaintiffs' favor therefrom, as true, Plaintiffs have alleged sufficient facts to survive a qualified immunity defense.

## III. CONCLUSION

For all the foregoing reasons, the SAC must survive dismissal, or partial dismissal, and the MTD should be denied in its entirety.

**RESPECTFULLY SUBMITTED** this 22nd day of November 2024.

**MILLS + WOODS LAW, PLLC**

By  */s/ Sean A. Woods*
Robert T. Mills
Sean A. Woods
5055 N 12th Street, Suite 101
Phoenix, AZ 85014
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2024, I electronically transmitted the foregoing document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Courtney R. Glynn
glynnc@mcao.maricopa.gov
Michael E. Gottfried
gottfrim@mcao.maricopa.gov
**RACHEL H. MITCHELL**
**MARICOPA COUNTY ATTORNEY**
CIVIL SERVICES DIVISION
judith.ezeh@mcao.maricopa.gov
christij@mcao.maricopa.gov
rita.kleinman@mcao.maricopa.gov
scottr@mcao.maricopa.gov
225 W Madison St.
Phoenix, AZ 85003
*Attorneys for Maricopa County, Dimas, Hawkins, Hertig, Martin, Montano, Moody, Park, Smith, Chester, Rainey, Marsland, Struble, Crutchfield, Magat, Dailey, and the Maricopa County Sheriff*

　　　　*/s/ Ben Dangerfield*